IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIRESTONE FINANCIAL, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 21 C 1183 |
| v. | ) |
| | ) Judge John Z. Lee |
| WA GYM NAPERVILLE NORTH; LLC; WA GYM DOWNERS GROVE, LLC; WORKOUT ANYTIME DARIEN, INC; WA NAPERVILLE INC. f/k/a WORKOUT ANYTIME NAPERVILLE INC.; and MICHAEL MUFARREH, | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

During the early months of the COVID-19 pandemic, Illinois Governor J.B. Pritzker issued a series of executive orders that closed and restricted nonessential business operations in order to stop the spread of the virus. This case concerns whether those orders excused several Chicago-area gyms—WA Gym Naperville North, LLC ("WA Naperville"), WA Gym Downers Grove, LLC ("WA Downers Grove"), and Workout Anytime Darien, Inc. ("WA Darien")—and their manager, Michael Mufarreh, (collectively "Defendants") from making payments under several commercial loan agreements between themselves and Plaintiff Firestone Financial, LLC ("Firestone"). The parties have filed cross-motions for summary judgment on Firestone's breach of contract, breach of guaranty, replevin, and detinue claims. For

the following reasons, Firestone's motion for summary judgment is granted, and Defendants' motion is denied.

## I. Background[1]

Defendants operate several franchised fitness center locations in the Chicago suburbs. Defs.' LR 56.1(b)(3) Statement Additional Facts ("DSOAF") ¶¶ 1, 3, ECF No. 78. In the years before the pandemic, Defendants' gyms had achieved considerable success by offering 24-hour access and low-cost memberships that a member could cancel at any time. *Id.* ¶ 2.

Since at least 2014, Defendants' gyms had used Firestone, a financial services company, as a commercial lender to finance their gym equipment. *Id.* ¶ 3. The instant dispute concerns two of these loans—an October 2017 agreement between Firestone and WA Downers Grove, and a January 2018 agreement between Firestone and WA Naperville North. Pl.'s Statement Facts Pursuant LR 56.1(a) ("PSOF") ¶¶ 8, 25, ECF No. 68; *see id.* Ex. 1, Downers Grove Agreement, ECF No. 68; *id.* Ex. 7, Naperville Loan Agreement, ECF No. 68 (collectively, the "Loan Agreements").

Several provisions of the Loan Agreements are relevant to this case. First, the Loan Agreements define "Borrower's failure to make any payment when due under the loan" as an "Event of Default," under which "at Lender's option, all indebtedness immediately will become due and payable," and "Lender shall have all the rights and remedies provided in the Related Documents." Loan Agreements at 4–5. "Related Documents" are in turn defined to include "security agreements." *Id.* at 7.

---

[1] The following facts are undisputed or deemed admitted, unless otherwise noted.

Second, the Loan Agreements contain an affirmative covenant requiring Defendants to "comply with all laws, ordinances, or regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations . . . ." *Id.* at 3.

Finally, the Loan Agreements also contain a negative covenant, which provides that Defendants may not, "without the prior written consent of Lender, . . . engage in any business activities substantially different from those in which Borrower is presently engaged." *Id.* at 3–4.

The parties executed several other documents in connection with the Loan Agreements. Defendants WA Darien, WA Naperville, and Mufarreh each signed guaranties for the Downers Grove Agreement, *id.* ¶¶ 9–11, and Defendants WA Darien, WA Naperville, WA Downers Grove, and Mufarreh each signed guaranties for the Naperville North Agreement. *Id.* ¶¶ 26–29. Furthermore, as security for each loan, Defendants gave Firestone a security interest in nearly $200,000 worth of Defendants' gym equipment (the "Equipment") pursuant to two security agreements. *Id.* ¶¶ 8, 25; *see id.* Ex. 1, Downers Grove Agreement—Commercial Security Agreement, ECF No. 68; *id.* Ex. 7, Naperville North Agreement—Commercial Security Agreement, ECF No. 68 (collectively the "Security Agreements").

From 2017 to March 2020, Defendants were current on all of their loan payments to Firestone. DSOAF ¶ 5. But, on March 20, 2020, Governor Pritzker ordered all fitness centers and gyms in the state to close to mitigate the spread of COVID-19. *See* Off. of Governor J.B. Pritzker, Exec. Order 2020-10 §§ 1.2–1.3 (Mar.

3

20, 2020), https://www2.illinois.gov/Documents/ExecOrders/2020/ExecutiveOrder-2020-10.pdf.[2] Five days later, on March 25, 2020, Firestone granted WA Downers Grove and WA Naperville 180-day deferrals (until August 25, 2020) of all payments due under the Loan Agreements. PSOF ¶¶ 14, 32. The deferrals provided that full payments under the Loan Agreements would resume on September 25, 2020. *Id.*

Governor Pritzker's order requiring Defendants' gyms to remain closed remained in effect until May 29, 2020.[3] Pl.'s LR 56.1(c)(2) Resp. Defs.' Statement Additional Facts ("Pl.'s Resp. DSOAF") ¶ 6, ECF No. 83. On that date, the Governor issued another executive order that, in relevant part, permitted gyms to reopen for the following activities:

> Personal training sessions involving one trainer and one customer; outdoor training in groups no larger than 10 with social distancing; sale of retail merchandise; and onsite filming or streaming of remote classes conducted by a single trainer.

Grp. Ex. E, Off. of Governor J.B. Pritzker, Exec. Order 2020-38 § 3(f) (May 29, 2020), https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-38.2020.html, ECF No. 68. The May 29 order further provided that "fitness and exercise gyms may not allow other activities, including member workouts, because of the heightened risk of transmission of COVID-19" from those

---

[2] The March 20 order required all businesses in the state to close unless the order designated them as "essential." Exec. Order 2020-10 § 1.2. Gyms were not among the categories of businesses listed as "essential." *Id.* § 1.12.

[3] The Governor extended the March 20 order, in relevant part, on April 30, 2020. *See generally* Off. of Governor J.B. Pritzker, Exec. Order 2020-32 (Apr. 30, 2020), https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-32.2020.html.

activities. *Id.* WA Naperville and WA Downers Grove elected not to reopen following the order. PSOF ¶¶ 71–72.

Governor Pritzker issued another executive order on June 26, 2020, which allowed gyms to reopen for member workouts "at a maximum of 50 percent capacity and with social distancing and other precautions." Grp. Ex. E, Off. of Governor J.B. Pritzker, Exec. Order 2020-43 § 3(g) (June 26, 2020), ECF No. 68. WA Naperville and WA Downers Grove, however, did not reopen when the new order permitted them to do so. WA Downers Grove reopened sometime in August 2020. PSOF ¶ 72; *see* Mufarreh Dep. at 50:14–22, ECF No. 68. WA Naperville never reopened. PSOF ¶ 73; Mufarreh Dep. at 23:14–17.

Even after their gyms were permitted to reopen, Defendants' business suffered greatly due to the pandemic. According to Defendants, this is because government restrictions "took away the attributes that distinguished [them] from other gyms"— namely, 24-hour access, low membership costs, and the ability for members to cancel their memberships at any time. DSOAF ¶¶ 2, 7–8. As a result, Defendants claim that they have suffered "severe losses every month" since reopening some of their locations. *Id.* Ex. A, Muffareh Decl. ¶ 10, ECF No. 78; *see id.* ¶ 9 ("Our revenue per location dropped by over 50%. Each location went from a profit of roughly $5,000 per month to a loss of $15,000 per month.").

When the deferral period for payments under the Loan Agreements expired in September 2020, Defendants failed to make any payment under the Naperville Loan Agreement. Defs.' Resp. PSOF ¶ 33, ECF No. 77. Defendants have not made

5

payments to Firestone under the Naperville Loan Agreement (or any of their guaranties of the same) since March 2020. *See id.*; Mufarreh Dep. at 73:16–74:3.

Defendants made payments under the Downers Grove Agreement from September 2020 to December 2020. Defs.' Resp. PSOF ¶ 15. After December 2020, Defendants did not make any payments under the Downers Grove Loan Agreement or any of their guaranties of the same. *See id.*; Mufarreh Dep. at 73:16–74:3.

Firestone mailed a number of written demands for payment of the amounts due under the Loan Agreements and Guaranties to Defendants on January 28, 2021. PSOF ¶¶ 22, 43. Firestone also demanded that Defendants return the Equipment. *Id.* When Defendants refused to comply, Firestone filed this suit.

## II.  **Legal Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The

6

nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)). To satisfy that ultimate burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal quotation marks omitted).

Where, as here, the parties have filed cross-motions, courts "take the motions one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party." *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016).

### III. <u>Analysis</u>

**A. Breach of Contract Claims[4]**

Under Massachusetts law,[5] to prevail on a breach of contract claim, a plaintiff must show "the existence of a valid and binding contract, that the defendant breached

---

[4] Defendants do not dispute that, if they have breached the underlying Loan Agreements, they have also breached the Guaranties, so the Court takes the two sets of claims together. Defs.' Resp. PSOF ¶¶ 19, 38.

[5] The parties agree that Massachusetts law applies to the breach of contract claims, pursuant to the choice of law clauses in the Loan Agreements and Guaranties.

the contract's terms, and that the plaintiff suffered damages as a result of that breach." *Scholz v. Goudreau*, 901 F.3d 37, 43 (1st Cir. 2018).

Defendants do not dispute that the Agreements and Guaranties are valid contracts, that they have failed to make various payments under the Agreements or Guaranties, or that Firestone has suffered damages from their nonpayment. Defs.' Resp. PSOF ¶¶ 8–18, 29–37. Instead, they contend that the doctrine of frustration of purpose excuses their nonperformance.[6]

Frustration of purpose discharges a contracting party's duties under a contract when the party's "principal purpose [in entering the contract] is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." *Chase Precast Corp. v. John J. Paonessa Co.*, 566 N.E.2d 603, 606 (Mass. 1991) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 265 (AM. LAW INST. 1981)). The party asserting frustration of purpose has the burden of proving that it applies. *Managed Air Sys., LLC v. Linden Auto Body Repair, Inc.*, No. 13–ADMS–10014, 2014 WL 886584, at *2 (Mass App. Ct. Feb. 27, 2014).

Typically, frustration of purpose "is a question for the trier of fact," *Chase*, 566 N.E.2d at 606, but the issue may be resolved at the summary judgment stage if the

---

[6] Defendants raised several other affirmative defenses in their answer, including commercial impracticability, failure to mitigate damages, and breach of the implied covenant of good faith and fair dealing. Verified Answer Aff. Defenses ¶¶ 1–33, 42–55, pp. 25–29, 31–32, ECF No. 19. Because Defendants make no reference to these defenses in their response to Firestone's motion for summary judgment or their own motion for summary judgment, *see generally* Defs.' Cross Mot. Summ. J., ECF No. 75; Defs.' Resp., they have waived any arguments as to those defenses.

undisputed facts clearly show that the defense either does or does not excuse the moving party's nonperformance. *See RFF Fam. P'Ship, LP v. Link Dev., LLC*, 962 F. Supp. 2d 344, 348 (D. Mass. 2013) (granting summary judgment on grounds that the undisputed facts clearly foreclosed a frustration of purpose defense); *NPS, LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 176–77 (D. Mass. 2010) (same).

A recent Massachusetts trial court decision, *UMNV 205–207 Newbury, LLC v. Caffe Nero Americas Inc.*, No. 2084CV01493-BLS2, 2021 WL 956069 (Mass. Sup. Ct. Suffolk Cnty. Feb. 8, 2021)), illustrates how the defense works in cases like this. There, the plaintiff was a landlord who had leased commercial space to the defendant, a coffee shop. *Id.* at *1. The lease contained language requiring that the premises be used "only to operate a café with a sit-down restaurant menu" that offered food and beverages "to customers who could sit and consume them on the premises." *Id.* at *5 (cleaned up). When the governor of Massachusetts banned restaurants and cafes from allowing "on-premises consumption of food or beverages" in response to the nascent COVID-19 pandemic, the coffee shop had to close, and it refused to pay rent. *Id.* at *2 (citation omitted). The landlord sued for breach of the lease, and the coffee shop raised frustration of purpose as a defense. *Id.* at *1.

The court held that frustration of purpose applied. First, the court held that, because the lease was conditioned on the use of the property as a café with indoor seating, "the absence of government orders barring all restaurants from serving customers inside[] was a basic assumption underlying the Lease." *Id.* at *5. Second, the court concluded that there was no evidence that the parties had contemplated,

9

much less allocated to the coffee shop in the lease, the risk that the governor would, in response to a deadly pandemic, enact an emergency order prohibiting indoor consumption of food and beverages. *See id.* at *5–6.

As Defendants see it, this case is similar to *UMNV*. They argue that the nonoccurrence of government regulation closing down gyms (and later, allowing them to operate only under significant restrictions) was a basic assumption underlying the Agreements. They then point to the absence of any language in the Agreements expressly allocating to Defendants the risk that government regulation would render their businesses inoperable (or prohibitively unprofitable).

Far from helping Defendants' case, *UMNV* shows why frustration of purpose does not apply here. In *UMNV*, the contract contained an express condition that the premises would be used for a very particular purpose—the operation of a coffee shop with indoor seating—that the pandemic orders rendered illegal. By contrast, here the Agreements are not conditioned on the Defendants' gyms being able to operate in a manner that Governor Pritzker's order prohibited. In fact, they do not contain any language specifying how the Equipment should be used at all.

To this point, Defendants point to a covenant in the Agreements requiring Defendants to obtain written consent from Firestone in order to "engage in any business activities substantially different than those in which [they are] presently engaged." Loan Agreements at 4. The Court fails to see how this clause helps Defendants. If it were a basic assumption of the Agreements that the gyms' business model would never change, the Agreements could easily have prohibited such a

10

change entirely, as did the lease in *UMNV*. *See* 2021 WL 956069, at *2 (lease provided that coffee shop could use premises "solely . . . in a manner consistent with other Caffe Nero locations in the Greater Boston area," and "for no other purpose").[7] Instead, the Loan Agreements have implicitly recognized the possibility of such a change—indeed, a "substantial" change—by providing that Defendants will not breach the agreements if they obtain consent from Firestone before making the change.[8]

Even granting Defendants' contention that their continuing ability to provide low-cost, 24-hour gym access free from government interference was a basic assumption underlying the Agreements, their frustration of purpose defense still fails because they have not shown that "the entire purpose of the [contract] was completely frustrated" by Governor Pritzker's orders. *UMNV*, 2021 WL 956069, at *5. While Defendants might be correct that Governor Pritzker's initial shutdown order rendered them unable to provide low-cost, 24-hour gym access, Defendants do not dispute that Firestone deferred all loan payments during the pendency of that order. And by the time payments became due again in August 2020, the limits on gyms were

---

[7] Moreover, the Court finds Defendants' reading of the covenant to be strained at best. In order to fall within the covenant, a difference in Defendants' business must be "substantial." The Court interprets "substantial" to mean something more than a mere change in business model or an adaptation to changing consumer demand. Rather, the context of the provision—for example, the title of the relevant section, "Continuity of Operations,"—reveals that "substantial" is more naturally read to refer to fundamental changes in Defendants' operations, such as converting their business to a wholly different purpose or function (*e.g.*, converting one of their gyms to a restaurant).

[8] Defendants also briefly advert to a covenant in the Loan Agreements requiring them to "[c]omply with all laws, ordinances, or regulations, now or hereafter in effect, of all governmental authorities." Loan Agreements at 3. But this term does not say that their compliance obligations excuse them from making payment.

11

far less restrictive—as of June 26, 2020, the state of Illinois permitted gyms to "operat[e] for member workouts at a maximum of 50 percent capacity and with social distancing and other precautions." Exec. Order 2020-43 § 3(g). And indeed, that is what WA Downers Grove did.

Recognizing this, Defendants argue that, even though they were technically permitted to open their gyms after the first few months of the pandemic, the relaxed restrictions still "destroyed the economic logic of the contract." Defs.' Resp. at 8. They "took away the attributes that distinguished Defendants from other gyms"—that is, 24-hour operations and low-cost membership—because adhering to that business model would have been prohibitively unprofitable under the new regulations. DSOAF ¶ 7; *see id.* at ¶¶ 8–9; Muffareh Decl. ¶¶ 9–10.

But the fact that an event made a party's business unprofitable is not enough to show that it frustrated the purpose of the party's contract. In this respect, *Gap, Inc. v. Ponte Gadea New York, LLC*, 524 F. Supp. 3d 224 (S.D.N.Y. 2021) is instructive. In that case, the Gap (a clothing retailer) had leased retail space on a well-traveled street in Midtown Manhattan. *Id.* at 228. When the pandemic arrived in March 2020, the Gap closed its Midtown store pursuant to government orders and refused to pay rent. *Id.* at 229–30. In early June, pandemic restrictions loosened to allow retailers such as the Gap to permit socially-distanced in-person shopping at fifty-percent capacity. *Id.* at 230. The Gap began to offer in-person shopping at its other New York City locations, but it did not reopen its Midtown location. *Id.*

12

The Gap and its landlord cross-claimed for breach of the lease. *Id.* at 228. The Gap contended that frustration of purpose excused it from payment because the purpose of the lease was for the Gap to operate in a "busy high end shopping district" with heavy foot traffic, *id.* at 235, and "the precipitous decline in foot traffic and office workers" due to the pandemic "destroyed the entire economic justification for the consideration demanded and paid for the premises." *Id.* at 236.

The court rejected the Gap's argument. It began by noting that, to show frustration of purpose, "it is not enough that the transaction will be less profitable for the affected party or even that the party will sustain a loss." *Id.* at 234 (cleaned up). Noting that the Gap had the option to reopen its Midtown store for in-person shopping (as it had done with other stores in the city), the court concluded that the Gap had made a "business decision" not to reopen because it could not turn a profit, due to the decline in foot traffic in that area. *Id.* at 235–36. The court concluded that "[t]he possibility that the stores at issue in this case may suffer particularly adverse financial consequences from the COVID-19 pandemic," without a showing that the Gap was actually unable to operate out of the leased premises, was not enough to show that the pandemic had frustrated the purpose of the lease. *Id.* at 236 (collecting cases); *see also, e.g.*, *Williamsburg Climbing Gym Co., LLC v. Ronit Realty LLC*, No. 120CV2073FBRML, 2022 WL 43753, at *4 (E.D.N.Y. Jan. 5, 2022) ("All [Plaintiff] has managed to demonstrate here is that, as a result of the emergency measures undertaken for public safety during the pandemic, its business model was not profitable. That is not enough."); *In re Cinemex USA Real Estate Holdings, Inc.*, 627

13

B.R. 693, 698 (Bankr. S.D. Fla. 2021) (frustration of purpose inapplicable where government orders had permitted movie theaters to reopen at fifty percent capacity, but theater delayed reopening because it would not have been profitable); *S.E.C. v. Equitybuild*, No. 18 C 5587, 2021 WL 4159507, at *3 (N.D. Ill. Aug. 13, 2021) (frustration of purpose did not excuse breach of agreement to purchase real estate, where purchaser alleged that the pandemic made it unprofitable to purchase real estate, but did not allege that it prevented purchaser from closing the sale or deriving any value from the property); *1174-1178 Cambridge St., LLC v. Goden St., Inc.*, No. 201895, 2021 WL 404863, at *6 (Mass. Sup. Ct. Suffolk Cnty. July 29, 2021) (frustration of purpose did not excuse nonpayment of rent during period where restaurant chose to remain closed even though government orders permitted it to reopen).

Similarly, here, Defendants have not alleged that they were completely prohibited from running their business after their payments became due. Rather, the record shows that, on and after the end of the deferral period on August 25, 2020, Defendants could have opened (and in the case of WA Downers Grove, did open) their doors to members at fifty-percent capacity and subject to social-distancing and masking requirements. Defendants state that, to the extent they delayed reopening, they did so because those restrictions made it impossible for them to make a profit while adhering to their 24-hour, low-monthly-fee business model. *See* Mufarreh Dep. at 50:14–51:3, 56:17–57:2; Muffareh Decl. ¶ 9. While unfortunate, that situation does not amount to frustration of purpose.

Accordingly, Defendants' frustration of purpose defense fails as a matter of law. Firestone therefore is entitled to summary judgment in its favor as to its claims for breach of the Loan Agreements and Guaranties, and Defendants' motion is denied as to those claims.

**B.     Replevin Claims**

Firestone asserts that Defendants' default under the Loan Agreements and Guaranties entitles Firestone to an order of replevin for repossession of the Equipment. Under Illinois law,[9] "[w]henever any goods or chattels have been wrongfully distrained, or otherwise wrongfully taken or are wrongfully detained, an action of replevin may be brought for the recovery of such goods or chattels, by the owner or person entitled to their possession." 735 Ill. Comp. Stat. 5/19-101. A claim for replevin requires the plaintiff to prove that "(1) it is the relevant property's owner or [is] lawfully entitled to its possession; (2) that the property is wrongfully detained by the defendant (after the defendant has refused a demand to surrender the property); and (3) that the property is not subject to any state tax, assessment, or fine." *Walgreens Co. v. Peters*, No. 21 C 2522, 2021 WL 3187726, at *2 (N.D. Ill. July 28, 2021) (citing § 5/19-104).

As to the first element, the Security Agreements (the validity of which Defendants do not challenge) give Firestone first-priority security interests in the Equipment. *See* PSOF ¶¶ 8, 13, 25, 31, 55. The Security Agreements also authorize

---

9         The parties agree that Illinois law applies to Firestone's replevin and detinue claims, pursuant to the Illinois choice of law clause in the Security Agreements.

15

Firestone to repossess and sell the Equipment upon Defendants' default under the Loan Agreements and Guaranties. *Id.* ¶ 56; *see* Loan Agreements at 4. For reasons already explained, Defendants have defaulted under the Loan Agreements and Guaranties, and Firestone is "lawfully entitled to possession" of the Equipment. § 5/19-104.

Firestone also has proven that Defendants have wrongfully detained the Equipment, because Defendants have retained possession of the Equipment despite Firestone's demand for its return. PSOF ¶¶ 22, 43, 64–67; *see PNC Equip. Fin., LLC v. Flash Limousine, Inc.*, No. 20 C 6773, 2021 WL 3142124, at *4 (N.D. Ill. July 25, 2021) (citing *First Illini Bank v. Wittek Indus., Inc.*, 634 N.E.2d 762, 763 (Ill. App. Ct. 1994)). Finally, the Equipment has not been taken for any tax, fine, or assessment pursuant to Illinois law. PSOF ¶ 60.

In light of the foregoing, the Court grants Firestone's motion for summary judgment on its replevin claims and denies the Gym's cross-motion as to those claims.

**C. Detinue Claims**

Firestone's last claims sound in detinue, a common law analogue of replevin. "Similar to replevin, a finding for plaintiff in a detinue action is proper where it is established that plaintiff's right to possession is superior to that of [the] defendant." *Koerner v. Nielsen*, 8 N.E.3d 161, 163 n.1 (Ill. App. Ct. 2014). As discussed above, Defendants have defaulted on their obligations under the Loan Agreements and Guaranties, and the Security Agreements entitle Firestone to retake possession of the Equipment upon such a default. Thus, the undisputed facts show that Firestone

16

is entitled to summary judgment on its detinue claims as well, and Defendants' cross-motion is denied as to these claims.

### D.     Attorneys' Fees

Firestone seeks an award of attorneys' fees and costs, pursuant to fee-shifting clauses in the Loan Agreements, Guaranties, and Security Agreements. *See* Loan Agreements at 5; Guaranties at 3; Security Agreements at 5. Federal courts apply state law when considering requests for attorneys' fees in diversity cases. *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1048 (7th Cir. 2016).

Here, both Massachusetts law and Illinois law enforce fee-shifting provisions in contracts. *See Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 835 (7th Cir. 2020); *Wong v. Luu*, 34 N.E.3d 35, 42 (Mass. 2015). And Defendants have not argued that the fee-shifting provisions are otherwise invalid. Thus, the Court awards reasonable attorneys' fees and costs to Firestone.[10]

---

[10]     Firestone is directed to provide Defendants with a letter setting forth a demand for its reasonable attorneys' fees and costs, including a detailed itemization and documents to support the demand, by September 23, 2022. In the event that the amounts are disputed, the parties are ordered to meet and confer and provide a written status report to the Court on October 6, 2022.

## IV. Conclusion

For the reasons stated above, Firestone's motion for summary judgment is granted in its entirety, and Defendants' cross-motion for summary judgment is denied.

**IT IS SO ORDERED.**  **ENTERED: 9/7/22**

**John Z. Lee**
**United States District Judge**